IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| ANTHONY CREECH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| v. ) | No. 3:07-CV-267 |
| ) | |
| DEROYAL INDUSTRIES, INC. and ) | |
| THE PRUDENTIAL INSURANCE ) | |
| COMPANY OF AMERICA, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

This civil action is brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*. It is now before the court for consideration of plaintiff's motion for judgment [doc. 13] and the motion for judgment [doc. 11] filed by defendants DeRoyal Industries, Inc. ("DeRoyal") and the Prudential Insurance Company of America ("Prudential"). The parties have filed responses [docs. 15, 16], and the motions are ripe for the court's consideration. For the reasons stated herein, plaintiff's motion will be denied, defendants' motion will be granted, and this civil action will be dismissed.

I.

*Procedural Background*

Prudential issued to DeRoyal an insurance plan (the "Plan" or "Policy") that provides short term ("STD") and long term ("LTD") disability benefits. [A.R. 004-017].[1] DeRoyal is the Plan administrator. [A.R. 071]. Prudential is the claims administrator. [A.R. 072]. In its initial phase, the Plan defines "disability" as:

> You are disabled when Prudential determines that:
>
> > you are unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
> >
> > you have a 20% or more loss in weekly earnings due to the same sickness or injury.

[A.R. 031] (emphasis in original).

Plaintiff worked at DeRoyal as a material handler from 1996 through 2004. He filed a claim for STD benefits on November 8, 2004, alleging that he could no longer work due to "hypogammaglobulinemia, inflammatory arthritis, recurrent pnuemonia [sic], asthma, [and] bronchitis." [A.R. 110-11].[2]

After being diagnosed with hypogammaglobulinemia, plaintiff began receiving monthly gamma globulin infusions ("IVIG") in 2002. He contends that "[a]lthough [he]

---

[1] References to "A.R." indicate a page or pages of the administrative record.

[2] "Hypogammaglobulinemia" is a condition of abnormally low levels of all classes of antibodies. *See Dorland's Illustrated Medical Dictionary* 863, 880 (29th ed. 2000). The condition is alternately referred to in the record as "immunodeficiency," "variable immune deficiency syndrome," and "common variable immunodeficiency."

2

suffers from a number of maladies and injuries . . ., variable immune deficiency syndrome is the primary cause of his disability." [Doc. 14, p. 5]. Apparently, side effects of IVIG therapy include headaches and joint pain, and pain is a principal reason why plaintiff is purportedly unable to work. In addition, plaintiff claims to be "highly vulnerable to any exposure, however small, to a large number of environmental hazards." [Doc. 14, p. 4]. For example, he ultimately stopped working shortly after allegedly being "overcome by dust and bird droppings from material that was being cleaned by a fellow worker." [Doc. 14, p. 4].

Plaintiff received benefits from November through December 2004. [A.R. 076, 084]. By letter dated December 1, 2004, Prudential notified him that his STD payments would be discontinued. [A.R. 076].

Plaintiff submitted additional information, but Prudential denied his claim a second time by letter dated January 26, 2005. [A.R. 084]. Prudential again restated its decision via letter dated August 3, 2006. [A.R. 091]. Plaintiff filed an appeal with Prudential the following month. [A.R. 124]. Prudential then sought review of the medical record by "a physician who specializes in Allergy and Immunology . . . ." [A.R. 094]. Prudential informed plaintiff by letter dated December 12, 2006, that it was denying his appeal. [A.R. 096]. In sum, the letter advised,

> Since Mr. Creech does not have a proven immune deficiency and has only mild asthma/Chronic Obstructive Pulmonary Disorder (COPD) in part due to cigarette smoking, there is no basis for any limitation from an allergy/immunology standpoint. Due to the lack of any proven allergic/immunology disorder, there is no evidence of functional impairment from an allergic/immunologic standpoint.

3

[A.R. 098].

Plaintiff submitted a second appeal to Prudential on December 28, 2006. [A.R. 129]. In part, plaintiff's counsel advised that he was enclosing "a notice of decision fully favorable from the Social Security Administration ["SSA"], wherein the Administrative Law Judge . . . found that because Mr. Creech's immune system is so severe, he is unable to perform any work existing in significant numbers in the national economy." [A.R. 129]. By letter dated February 16, 2007, Prudential informed plaintiff's counsel,

> We are unable to make an appeal determination on Mr. Creech's claim at this time because you have not yet provided important information concerning his claim. As of the date of this letter, we have not received the detailed letter regarding the Social Security Disability Benefits (SSDB) determination from the Social Security Administration, specifically from the Administrative Law Judge (ALJ). In addition, please provide any documentation supporting the ALJ decision.

[A.R. 103]. Plaintiff's counsel responded by letter on February 27, 2007, again enclosing the abbreviated SSA "notice of decision," which counsel termed "a detailed letter regarding the social security disability benefits determination . . . ." [A.R. 131]. By follow-up letter dated March 14, 2007, plaintiff's counsel wrote,

> The enclosed decision from the Social Security Administration, which is the short form decision, *is the only decision that is available*. However, in further support of Mr. Creech's claim, we are enclosing for your information and review a copy of the entire Social Security Administration file . . . .

[A.R. 133] (emphasis added).

Following review by in-house Medical Director Dr. John LoCascio, Prudential again affirmed its decision by letter dated April 30, 2007. [A.R. 104]. Plaintiff then filed

4

the present lawsuit on June 8, 2007.

## II.

*Standard of Review*

In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989), the United States Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. If a plan grants the administrator or fiduciary the appropriate discretionary authority, this court must instead review the decision at issue under the "highly deferential arbitrary and capricious standard of review . . . ." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). A plan's grant of discretionary authority to the administrator or fiduciary must be "express." *Perry v. Simplicity Eng'g,* 900 F.2d 963, 965 (6th Cir. 1990).

Decisions concerning eligibility for ERISA benefits are not arbitrary and capricious if they are "rational in light of the plan's provisions." *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988). "Before concluding that a decision was arbitrary and capricious, a court must be confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of evidence." *Marchetti v. Sun Life Assurance Co. of Canada*, 30 F. Supp. 2d 1001, 1008 (M.D. Tenn. 1998) (citing *Wahlin v. Sears, Roebuck & Co.*, 78 F.3d 1232, 1235 (7th Cir. 1996)).

5

The Policy contains the following provision:

> The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious.

[A.R. 072]. In addition, the Plan's definition of disability states, "You are disabled *when Prudential determines* that . . . ." [A.R. 031, 041] (emphasis added). Plaintiff acknowledges the existence of this language but "does not concede" that the arbitrary and capricious standard applies in this case. He does not, however, articulate any theory as to why another standard of review should be applied.

The court concludes that the Plan contains a clear, express grant of discretionary authority to Prudential. *See, e.g., Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005). The arbitrary and capricious standard will therefore be employed in the court's review.

Plaintiff does correctly note that there is an inherent conflict of interest in this case because Prudential is the decision-maker as well as the entity that pays benefits. However, the existence of this conflict does not alter the standard of review. *Marchetti*, 30 F. Supp. 2d at 1007. Instead, the administrator's conflict of interest is an additional factor to be considered by the court. *See id.; Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991). The court must also weigh the depth of consideration given by Prudential to the SSA's ruling, which "though certainly not binding, is far from meaningless," *Calvert*, 409 F.3d at 294.

6

III.

*Medical Record*

Plaintiff was referred to allergist Ty Prince in February 2004, reporting year-round sinus symptoms worsened by "*cut grass*, musty-moldy areas, outdoor pollens, *cigarette smoke* and weather changes." [A.R. 193]. It was noted that plaintiff smokes one pack of cigarettes per day. [A.R. 193]. March 2002 serum testing results led to Dr. Prince's observation that "one of" plaintiff's immunoglobin levels was low. [A.R. 213].[3] At his next appointment in June 2002, plaintiff continued to smoke but blamed his increased coughing and wheezing on "exposure to heavy dust at work." [A.R. 192]. Dr. Prince diagnosed common variable immunodeficiency and prescribed monthly gamma globulin infusions. [A.R. 192].

Plaintiff began to report severe arthralgias in September 2003. [A.R. 187]. The dosage of his IVIG infusions was increased by Dr. Prince in the spring of 2004. [A.R. 186]. Plaintiff continued to complain of severe pain at his September 2004 appointment, and Dr. Prince "strongly recommend[ed] disability for this patient." [A.R. 185]. In December 2004, Dr. Prince wrote "To Whom It May Concern,"

---

[3] As noted above, hypogammaglobulinemia is traditionally defined as a condition of abnormally low levels of *all* classes of antibodies. *See Dorland's Illustrated Medical Dictionary* 863, 880 (29th ed. 2000).

7

> Although we have been treating him with gammaglobulin infusions, he subsequently has developed severe arthritis, which has dramatically decreased his ability to work. . . . His arthritis has significantly diminished his ability to perform physical labor of any kind. Although I am very reluctant to recommend disability for the majority of patients who ask, I strongly believe he is entitled to this assistance.

[A.R. 168]. Dr. Prince then completed a medical/vocational questionnaire in August 2005. He predicted significant limitations secondary to common variable immunodeficiency and "severe arthritis." [A.R. 163-65]. Dr. Prince restated his questionnaire opinions in October 2006. [A.R. 167].

The record contains 2003-04 treatment notes of Dr. Vivek Venkatesh relating to "sinus congestion, cough, and wheezing." Dr. Venkatesh has cited acute bronchitis and a "history of common variable immunodeficiency." [A.R. 160].

Dr. Venkatesh noted on October 9, 2003, that plaintiff continued to work 60-65 hours per week despite complaints of respiratory difficulties and chronic pain. [A.R. 160-61]. Dr. Venkatesh has repeatedly instructed plaintiff to stop smoking [A.R. 141, 144, 149, 155, 160] and has specifically cited a connection between his smoking and the likelihood of recurring respiratory infection. [A.R. 154-55]. Terming plaintiff a "heavy smoker" [A.R. 154], Dr. Venkatesh has stated,

> He is advised in no uncertain terms that he needs to quit smoking. At this time he has [reportedly] had several prior episodes of pneumonia and he also continues to smoke and basically what he is trying to do is light the candle from both ends, so to speak; and I have advised him about this. He is strongly advised to quit smoking.

[A.R. 160].

8

On November 26, 2003, plaintiff was purportedly smoking only one cigarette every three to four days. [A.R. 151]. Dr. Venkatesh noted that plaintiff was "doing pretty well" with no "complaints or problems at this time." [A.R. 151]. Celebrex was also observed to be providing "good relief" of his pain. [A.R. 151]. At a February 2004 appointment, plaintiff reported sinus pressure with postnasal drip, along with "headaches and neck pain each time he gets his infusions." [A.R. 149]. Dr. Venkatesh "advised on sputum expectoration" and smoking cessation. [A.R. 149]. In May 2004, plaintiff reported abdominal problems which Dr. Venkatesh opined were secondary to his IVIG treatment. [A.R. 144]. In June 2004, plaintiff's smoking had increased and he sought treatment for cough, congestion, and sinus pressure. [A.R. 139, 141]. In December 2004, plaintiff again sought treatment for sinus problems and coughing. [A.R. 136]. Dr. Venkatesh again wrote, "Smoking cessation is of paramount importance for him." [A.R. 136].

Plaintiff first visited rheumatologist Aqueel Kouser in August 2004. Dr. Kouser's records mention common variable immunodeficiency, but there is no indication that this was an independent diagnosis as opposed to merely a carryover of Dr. Prince's opinion. [A.R. 283, 304, 307]. September 2004 images of the spine, elbows, hands, and knees were unremarkable. [A.R. 295-303]. In September 2005, Dr. Kouser wrote that "etiology of [his] arthralgias remains unclear to me," as "all his tests have been negative." [A.R. 304]. Dr. Kouser also "explained to him that I have no experience whatsoever with the patients with common variable immune deficiency syndrome." [A.R. 307].

9

Plaintiff was examined by the staff of Dr. Leon Cochran in June 2005 in conjunction with the Social Security application. Dr. Cochran recorded plaintiff's self-reported hypogammaglobulinemia as diagnosed by Dr. Prince. [A.R. 340]. Dr. Cochran also noted plaintiff's claim of having "had pneumonia about 30 times or more in his lifetime." [A.R. 340].[4] Plaintiff told Dr. Cochran that his joint pain is a side effect of the gamma globulin injections. [A.R. 340-41]. He also told Dr. Cochran that he continues to smoke and that he suffers from asthma which is exacerbated by, inter alia, smoke. [A.R. 341-42]. Dr. Cochran opined that plaintiff could work at the sedentary level if a sit/stand option were available. [A.R. 346-47].

Norman Hankins, Ed.D generated a vocational evaluation in May 2006. Dr. Hankins opined, "With the restrictions indicated by Dr. Prince, there are no jobs that he can perform." [A.R. 356]. In February 2002, Dr. Hankins had also "assessed vocational disability based on the functional restrictions contained in the medical records at that time," but plaintiff continued to work on a full-time basis for almost three years after that assessment. [A.R. 351].

At the request of plaintiff's attorney [A.R. 372], Dr. Choudhury Salekin examined plaintiff in April 2005 and March 2006. Dr. Salekin's initial report recites the medical history, including Dr. Prince's diagnosis of variable immune deficiency syndrome. [A.R. 368]. As of April 2005, plaintiff continued to smoke one pack of cigarettes per day

---

[4] This claim is not objectively substantiated by the administrative record.

10

and continued to complain of shortness of breath. [A.R. 369]. He blamed his respiratory difficulties on workplace concrete dust and pigeon feces. [A.R. 369]. On examination, plaintiff appeared to be in no acute distress but demonstrated scattered wheezing in both lungs. [A.R. 369]. Despite plaintiff's continued smoking, Dr. Salekin opined that the wheezing was "[m]ost likely occupational Asthma induced or aggravated by frequent dust exposure at the Warehouse of DeRoyal Industries." [A.R. 370-71]. Dr. Salekin further opined that plaintiff's reported joint pain was "most likely from complication of immunoglobulin treatment." [A.R. 370]. Carpal tunnel testing was positive, but Dr. Salekin wanted to obtain additional test results before assigning an impairment rating or restrictions. [A.R. 370]. He eventually opined that plaintiff could work at the light level of exertion with some postural limitation. [A.R. 580].

In November 2006, board certified allergist/immunologist Zuhayr Hemady reviewed plaintiff's medical record at Prudential's request. Dr. Hemady concluded,

> Mr. Creech had no functional impairment from an allergy/immunology standpoint at any time.
>
> The diagnosis of common variable immune deficiency is incorrect and the claimant's arthralgias may be a side effect of the IVIG. The diagnosis of common variable immune deficiency requires a low IgC, generally below 400 mg/dl, with low IgM and/or IgA along with documented evidence of recurrent bacterial sinopulmonary infections backed by imaging studies or bacterial cultures. Further, the pre IVIG level of IgC was only very slightly decreased at 679 mg/dl with a normal range of 694-1618 and IgA and IgM were normal. Further, a sine qua non for establishing immune deficiency in the setting of only slightly decreased [IgG] is the evaluation of antibody responses to vaccines such as pneumococcal vaccines, and this was not done. Therefore, the submitted medical records do not objectively document any immune

11

> deficiency that would lead to functional impairment from an allergy/immunology standpoint.
>
> . . .
>
> Since the claimant does not have a proven immune deficiency and has only mild asthma/COPD in part due to cigarette smoking, there is no basis for any limitation from an allergy/immunology standpoint. . . .

[A.R. 378-79].

In-house Prudential physician John LoCascio reviewed the medical record in January 2007. Dr. LoCascio questioned "why Dr. Venkatesh would attribute the acquired pulmonary symptoms to 'asthma' when the patient is a long-term smoker who continues to smoke." [A.R. 430]. Dr. LoCascio could "find no clear and significant flaw in the prior internal and independent analysis based on the available data in the file." [A.R. 431]. He declined to further address the appeal, stating, "I cannot address the questions asked because the attorney predicates the re-appeal on the SSDB ALJ award, but the attorney has provided none of the medical data and reasoning upon which the award is based." [A.R. 431].

In March 2007, after counsel submitted the SSA administrative record, Dr. LoCascio again observed, "Unfortunately, the primary document that we need [the text of the ALJ's decision] is not in the data." [A.R. 435]. He concluded,

> I have also carefully looked in the records for the frequency of hospitalizations for sinus and other infections. I have not found any over the past several years. Besides some indication of chronic sinusitis (a relatively common finding in normal patients), the other testing provided is either completely normal, indicates only minor impairment (the pulmonary tests), or "normal wear and tear" (in contrast to the reports of severe arthritis[)].

12

[A.R. 436].

IV.

*Analysis*

The court has reviewed the record concerning the denial of benefits in this case under the arbitrary and capricious standard and in so doing has taken into account the pecuniary conflict of interest and the SSA decision as factors in the analysis. With regard to the application of the arbitrary and capricious standard, the Sixth Circuit has stated, "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F. 2d 689, 693 (6th Cir. 1989) (citation omitted). This standard is the "least demanding form of judicial review of administrative action." *Id.* In its review of the denial of benefits, this court does not substitute its judgment for that of the administrator. *Brown v. Nat'l City Corp.*, 974 F. Supp. 1037, 1041 (W.D. Ky. 1997) (citing *Caterino v. Barry*, 8 F.3d 878, 883 (1st Cir. 1993)).

The present plaintiff contends "that *every* physician or medical provider who examined [him] during the relevant time period . . . and also the ALJ who considered the matter for the Social Security Administration, concluded that he suffered from variable immune deficiency syndrome, and was totally disabled." [Doc. 14, p. 5] (emphasis in original). According to plaintiff, Prudential acted arbitrarily and capriciously in relying on a "simple paper-only review" rather than adopting "the overwhelming consensus of medical

13

professionals who had examined" him.  [Doc. 14, p. 10].  The court cannot agree.

Plaintiff overstates the conclusions of his examining physicians.  First, "every" examining physician has not opined that he is disabled.  Drs. Kouser and Venkatesh have offered no such opinion, and Drs. Cochran and Salekin have opined that he can perform a restricted range of work.  Although vocational expert Hankins has opined that plaintiff is disabled, he offered that same opinion in 2002 yet plaintiff continued to work full-time for more than thirty months afterward.[5]

As for plaintiff's allegation that "every" examining physician has diagnosed him with hypogammaglobulinemia, only Dr. Prince has actually made that diagnosis.  The administrative record does not make clear that any other source has done anything other than accept and repeat Dr. Prince's opinion.

Thus, the record before Prudential consisted of the conflicting assessments of two board certified allergists/immunologists - treating physician Prince and reviewing physician Hemady.  Under the facts of the present case, it was neither unreasonable nor irrational for Prudential to adopt the views of Dr. Hemady as that opinion was far more detailed.  In fact, a significant part of that detail was Dr. Hemady's explanation of why Dr. Prince's assessment was objectively unsupported and incorrect.

---

[5] Further, Dr. Hankins's most recent opinion (that plaintiff is unemployable) is based on Dr. Prince's opinion.  If Dr. Prince's opinion can reasonably be rejected, then Dr. Hankins's opinion falls aside as well.

14

The undersigned is not an immunologist and obviously must therefore rely on the expertise of the medical sources. Dr. Prince's December 2004 disability letter stated that "lab work revealed low levels of antibodies [plural], as well as diminished response to vaccines." [A.R. 168]. However, his treatment notes, and the corresponding test results [A.R. 212-13], show only *one* low antibody level (at only one subclass) and contain no informative analysis of any vaccine testing results. Conversely, Dr. Hemady's report covers both points in explaining the conclusion that plaintiff's immune system is not as weak as alleged. If it was not unreasonable or irrational for Prudential to adopt Dr. Hemady's better-explained opinion, then it was also neither unreasonable nor irrational for Prudential to conclude that plaintiff has been misdiagnosed by Dr. Prince and that he is unnecessarily receiving IVIG infusions, the admitted source of his purportedly disabling pain.

In addition, Dr. Hemady's opinion is not entitled to less weight because he did not personally examine plaintiff. Like Dr. Hemady, Dr. Prince reached his conclusion based on a review of test results. There is no indication that hands-on examination played any part in Dr. Prince's immunology diagnosis. Therefore, Dr. Prince and Dr. Hemady both reached their conclusion based on "paper review." Prudential simply adopted the "paper review" that it found most credible.

It was also reasonable for Prudential to consider the impact of plaintiff's heavy smoking throughout its evaluation process. [A.R. 417, 426, 430]. Dr. Venkatesh has strongly cited a connection between plaintiff's smoking and his respiratory difficulties, and

15

he has told plaintiff "in no uncertain terms that he needs to quit smoking." Further, plaintiff has acknowledged that his sinus symptoms are worsened by cigarette smoke and grass clippings, yet he continues to smoke and mow his lawn. [A.R. 477]. This supports the conclusion that his plaintiff's condition is not nearly as bad as alleged and it severely impacts the credibility to which any of his complaints are entitled. Plaintiff's credibility is further diminished when the claim that "I was diagnosed as having been born without an immune system" [A.R. 488] is juxtaposed with Dr. Hemady's objectively-supported opinion that all antibody levels are either normal or only slightly low.

Finally, the court must address Prudential's treatment of the Social Security file. Prudential argues that it could only give minimal weight to the Commissioner's ruling because plaintiff did not provide a copy of the actual decision for review. Plaintiff counters that Prudential's explanation is duplicitous, "facetious at best and plainly offered in obvious bad faith. . . . [I]f the Court is looking for the bad faith necessary to trigger application of the conflict of interest factor . . . an examination of Prudential's treatment of the social security issue would be a good place to start." [Doc. 15, p. 6, 8]. Plaintiff's accusations are misdirected.

Prudential repeatedly requested a copy of the ALJ's decision. In response, plaintiff claimed that the unenlightening short form was "the only decision that is available." That is not an accurate statement. The record does show that the "facts and reasons" underlying the Commissioner's decision were articulated in an *oral* decision at plaintiff's

16

October 2004 administrative hearing. [A.R. 446]. Thus, the only SSA decision *immediately available* was the short form, in which the ALJ explained only that "I found you disabled . . . because of immune system so severe that you are unable to perform any work existing in significant numbers in the national economy." [A.R. 446]. However, in the next sentence, the ALJ advised plaintiff, "If you want more information about my decision, you or your representative should file a written request for this information at any local Social Security office or a hearing office. . . . **If you ask for it, we will provide you with a record of my oral decision at the hearing.**" [A.R. 446] (emphasis added).

Therefore, a copy of the ALJ's decision *was* available had plaintiff or his attorney simply requested it. Rather than cooperating with Prudential's request to obtain and provide a copy of that decision, plaintiff instead took the position that the document did not or could not exist. Prudential has not engaged in "duplicitous, facetious, and bad faith" conduct regarding the Social Security record. Prudential asked repeatedly for the information it needed, and plaintiff repeatedly refused to provide it. To the extent that the administrative record is incomplete, Prudential is not the party to blame.

Prudential reviewed the Social Security documentation provided to it. Prudential correctly observed that most of the Social Security record was duplicative of the administrative record already on file. Due to plaintiff's refusal to obtain and submit a copy of the ALJ's decision, the Commissioner's file thus added nothing of substance to Prudential's analysis. Further, the ALJ did not have the benefit of Dr. Hemady's opinion for

17

his consideration, so whatever reasoning the ALJ applied would have involved a different body of evidence. For all these reasons, the court finds nothing arbitrary or capricious in Prudential's evaluation of plaintiff's Social Security file.

V.

*Conclusion*

The court cannot say that Prudential's denial of benefits was irrational, unfounded, or without reasoned explanation. In reaching this conclusion, the court has considered: (1) the SSA's determination that plaintiff is disabled, which "though certainly not binding, is far from meaningless," *Calvert*, 409 F.3d at 294; and (2) Prudential's inherent conflict of interest in its dual roles of administrator and payor. *See id*. at 292-93.

In his benefits application, plaintiff claimed to be disabled by hypogammaglobulinemia, arthritis, recurrent pneumonia, asthma, and bronchitis. The administrative record contains reliable evidence that plaintiff does not in fact suffer from hypogammaglobulinemia and that his immune system is not nearly as week as alleged. Plaintiff and several medical sources confirm that the monthly IVIG infusions are "the major problem" causing his arthralgias. [A.R. 601]. The administrative record contains reliable evidence indicating that those treatments are an unnecessary remedy for a misdiagnosis. As for plaintiff's claim of recurrent pneumonia, that allegation is objectively unsupported.[6] As

---

[6] Moreover, to Dr. Prince in February 2002, plaintiff "report[ed] up to 15 to 16 episodes of pneumonia with several hospitalizations since childhood." [A.R. 193]. However, in June 2005, he told Dr. Cochran's staff "that he has had pneumonia about 30 times or more over his lifetime." [A.R.
(continued...)

18

for the remaining claims of asthma and bronchitis, plaintiff continues to mow grass and smoke heavily despite being abundantly aware that those activities worsen his respiratory health. When plaintiff reduced his smoking to virtually zero, Dr. Venkatesh described him as "doing pretty well" with "no other complaints or problems at this time." [A.R. 151]. These contradictions could lead any reasonable factfinder to the conclusion that plaintiff's subjective limitations are not nearly as restrictive as alleged.

Prudential did not act arbitrarily or capriciously in its reliance on Dr. Hemady's file review. There is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," particularly where - as here - the reviewer's analysis was more thorough than that of the treating physician. *Calvert*, 409 F.3d at 296. The court recognizes, of course, that it may in fact be Dr. Prince whose opinion is correct. That possibility does not, however, alter the standard of review binding the court.

---

[6](...continued)
340]. The record does not document treatment for a single episode of pneumonia - let alone 15 episodes - between 2002 and 2005, further supporting the conclusion that plaintiff's complaints are overstated.

Under the circumstances of this case and the administrative record as discussed above, it was neither unreasonable nor irrational for Prudential to decide that plaintiff is not "disabled" as that term is defined by the Plan. Accordingly, the court will affirm the denial of benefits. An order consistent with this opinion will be entered.

ENTER:

s/ Leon Jordan<br>United States District Judge

20

Case 3:07-cv-00267   Document 17   Filed 08/20/08   Page 20 of 20   PageID #: 249